NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| STEVEN BLUMAN, | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. 08-0415 (GEB-DEA) |
| PLAN ADMINISTRATOR AND TRUSTEES FOR CNA'S INTEGRATED DISABILITY PROGRAM; CNA'S INTEGRATED DISABILITY PROGRAM; CNA; XYZ CORP. 1-10; and INDIVIDUALS ABC 1-10, | ) **MEMORANDUM OPINION** |
| Defendants. | ) |

**BROWN, Chief Judge**

This matter comes before the Court upon the motion for summary judgment filed by plaintiff Steven Bluman ("Bluman" or "plaintiff") (Doc. No. 40), as well as the motion for summary judgment filed by the Plan Administrator and Trustees for CNA's Integrated Disability Program, CNA's Integrated Disability Program, and CNA (collectively "defendants") (Doc. No. 44). Both motions are opposed. The Court has considered the parties' submissions and decided the matter without oral argument pursuant to Federal Rule of Civil Procedure 78. For the reasons that follow, the Court will deny plaintiff's motion for summary judgment and grant defendants' motion for summary judgment.

1

I.   BACKGROUND

This case involves a claim for unpaid short-term disability benefits ("STD benefits") under the terms of an ERISA[1] welfare benefit plan. The following undisputed facts are taken from the parties' submissions pursuant to L. Civ. R. 56.1. On January 31, 2000, plaintiff was working for defendant CNA Financial Corporation as a Tech Analyst III in its Monmouth Junction, New Jersey office. (Pl.'s 56.1 Stmt. at ¶ 18; Doc. No. 40-2.) On that date, he slipped and fell on ice in the parking lot, suffering injuries. (*Id.*) As a result of his injuries, plaintiff applied for and received STD benefits during the period from February 8, 2000 through May 12, 2000. (*Id.* at ¶ 19.) Plaintiff then returned to work for a period of approximately 14 months. (*Id.*) Plaintiff's last day of work was July 6, 2001. (*Id.* at ¶ 23.) During the 14-month employment period, plaintiff was notified that he was going to be laid off. (Defs.' 56.1 Stmt. at ¶ 4; Doc. No. 44-1.) He was notified in May 2001 that he would be terminated on July 20, 2001. (*Id.*)

A.   **Plan Construction and Funding**

CNA Financial Corporation ("CNA") was the sponsor and administrator of the STD Plan ("the Plan") at all relevant times. (Defs.' 56.1 Stmt. at ¶ 6; Doc. No. 44-1.) Benefits under the Plan are funded through the CNA Health Plan Trust. The Trust is funded by contributions made by plaintiff's employer, Continental, and these contributions to the Trust are for the sole purpose

---

[1] The Employee Retirement Income Security Act of 1974 ("ERISA") permits a person denied benefits under an employee benefit plan to challenge that denial in federal court. 88 Stat. 829, as amended, 29 U.S.C. § 1001 et seq.; *see* § 1132(a)(1)(B).

of making benefit payments to Plan participants.[2] (*Id.*) The Plan grants discretion to CNA as follows:

> The Plan Administrator has the discretionary authority to determine eligibility for benefits and to construe the terms of the Plans . . . The Administrator is assisted by various agents, attorneys and clerical assistants as needed to administer the plans effectively. The decisions of the Administrator, acting within the scope of his or her authority as defined by the various plan documents and contracts, are conclusive and binding on all persons concerned.

(Def.'s 56.1 Stmt. at ¶ 7; Doc. No. 44-1; *see also* AR[3] 005; 010.)

### B.     Medical Details

#### 1.     *Plaintiff's Short Term Disability Claim and Initial Information*

On July 11, 2001, Plaintiff was confirmed by his Primary Care Physician (Dr. Eiras) to be suffering from myofascial syndrome, radiculopathy, and chronic pain. (Pl.'s 56.1 Stmt. at ¶ 21; Doc. No. 40-2.) The Orlando Disability Claims Unit, the group of employees that administered the Plan, assigned plaintiff's claim to Disability Specialist Allison Taylor and Nurse Case Manager Susan Wolfe. (*Id.* at ¶ 22.) On July 17, 2001, Susan Wolfe interviewed Dr. Eiras, wherein Dr. Eiras told her that plaintiff was receiving magnesium injections for myofascial pain, and that he had this problem for approximately one year. (*Id.* at ¶ 27.) Also during this interview, he told her that MRIs revealed disc herniation at C5-C6, with right sixth nerve root impingement, and there was herniation at L5-S1 as well. (*Id.*) Two days later, Allison Taylor

---

[2] In responding to this paragraph, plaintiff states that it is "denied in part." However, in discussing why the paragraph is denied, plaintiff does not discuss or refute any evidence regarding the construction or purpose of the Trust. Therefore, the Court will treat this fact as undisputed.

[3] Citations to the Administrative Record will be abbreviated "AR."

interviewed plaintiff. (*Id.* at ¶ 29.) Plaintiff told her that he is unable to get out of bed most days, and that some days he has pain in his right arm, making it difficult to write[4]. (*Id.* at ¶ 30.) He also told her that he has a hard time sitting for long periods. (*Id.*) He further told Ms. Taylor that he can only use a computer occasionally, and even then he has to stop after about 15 minutes due to pain. (*Id.* at ¶ 31.) After additional statements about his pain, Ms. Taylor advised him that additional medical information was necessary before a decision could be made on his claim. (*Id.*)

### 2. The Plan's Methodology and Review of Plaintiff's Claim

On July 20, 2001, Susan Wolfe faxed a note to Drs. Eiras and Rhee,[5] requesting a copy of the MRI report, treatment plan, expected return to work date, and all office notes. (Pl.'s 56.1 Stmt. at ¶ 33; Doc. No. 40-2.) Dr. Eiras reported that a a visit with pain management and an MRI of plaintiff's lumbosacral spine were both pending, and therefore his return to work date was "unknown." (*Id.* at ¶ 36.) Further, Dr. Rhee said that "persistent pain in [his] head and neck" would prevent plaintiff from performing his job function, and likewise could not give any return date. (*Id.* at ¶ 38.) On August 1, 2001, Dr. Eiras faxed Ms. Wolfe a report of an MRI of plaintiff's cervical spine taken on July 30, 2001. (*Id.* at ¶ 40.) The next day, Ms. Wolfe entered notes regarding her review of the recent MRI studies. (*Id.* at ¶ 41.) She concluded that "clinical evidence does not indicate a functional impairment that would preclude [employee] from performing sedentary work, nor does it support pain reported by claimant." (Defs.' 56.1 Stmt. at

---

[4] Defendants do not dispute that plaintiff told Ms. Taylor these facts, but dispute the veracity of the underlying facts. (*See* Defs.' 56.1 Stmt. at ¶ 30; Doc. No. 52-1.)

[5] Dr. Rhee was a neurologist that was also treating plaintiff at the time.

4

¶ 12; Doc. No. 44-1; *see also* AR 207.)  Several days later, she provided an addendum to her previous assessment:

> Addendum to functional assessment dated 8/2/01.  Addn'l clinical provided from pain management Dr. Ndeto: indicated claimant has full power without any obvious sensory deficits, exam of his neck shows evidence of paraspinal muscle spasm as well as spasm of trapezius muscle on the rights.  Reflexes are 2+ in the upper extremities, gait is normal, patient is able to heel toe walk, power and sensory functions appear intact in the lower extremities, reflexes are 2+ as well.  Flexion and extension of the lumbar spine is fairly adequate without any pain exacerbation.  Claimant has good appetite.  Claimant's reports of pain are not supported by clinical evidence provided as well as reported ADL's (activities of daily living) during telephonic interview.  Claimant should be capable of performing at a sedentary level.

(*Id.* at ¶ 14.)  On August 7, 2001, Allison Taylor wrote plaintiff a letter formally denying his claim.  (*Id.* at 16.)  The letter states:

> Your current occupation as a Programmer, as described to us by your employer, is largely sedentary in nature.  Your duties primarily include sitting at a desk using a computer, calculator and telephone.  You are required to lift and carry less than one pound several times a day, with no overhead lifting or carrying required.  Your employer had indicated that your job duties will allow for periodic episodes of standing and re-positioning or walking as needed.  Your employer has also indicated that your job had been modified to allow you to work from home on days when you were unable to drive to work.  We were also informed that your job has been eliminated as of 07-20-01.
>
> After the review of your file, the medical evidence provided would not expect [sic] to produce impairment that would preclude you from performing your occupation as a Programmer.  We agree that you have a medical condition, however, the inability to perform sedentary work is not supported by the documented medical evidence provided.  In addition, your reported level of functionality performing daily activities of daily living are comparable to the functionality needed to perform the duties of your sedentary job as a Programmer.
>
> Based on the above information, we are unable to honor your claim for disability benefits. . . .

(*Id.*)  On the same day that plaintiff's application for STD benefits was denied, his claim for disability benefits under New Jersey's Temporary Disability Law were granted.  (Pl.'s 56.1 Stmt. at ¶ 51; Doc. No. 40-2.)

### 3. *Plaintiff's Appeals*

On August 23, 2001, plaintiff sent a letter to Ms. Taylor requesting the the Plan reconsider its denial of his benefits claim, and also included a letter from Dr. Rhee that stated, among other things, that "[plaintiff] has EMG-proven and MRI-proven radiculopathy secondary to herniated disc," that "he is totally disabled because of these conditions" and that "physical restrictions and limitations are long standing, sitting for extended periods of time in front of a computer, and managing the computer keyboard, which would not be recommended because this will aggravate his condition."  (Pl.'s 56.1 Stmt. at ¶ 53; Doc. No. 40-2.)  On August 27, 2001, Ms. Taylor responded, stating that her decision has not changed and that she would forward his appeal to the Appeals Committee.  (Defs.' 56.1 Stmt. at ¶ 18; Doc. No. 44-1.)

On September 28, 2001, Appeals Committee member Doris Gloss, R.N., sent plaintiff a letter denying his appeal and informing him that the medical evidence did not support a functional impairment precluding him from performing his occupation as a Programmer.  (*Id.* at ¶ 19.)  The letter states, in pertinent parts:

> Our review is based on the medical evidence that was submitted to CNA and was relied upon to conclude the termination of short-term disability benefits. After review of your file, in its totality, by Appeals, we must reaffirm the denial of benefits based on the following medical evidence and the plan provisions.  Appeals agreed with the intent, content and conclusions brought forth by the denial letter written on 8/7/01, and the chronological medical evidence mentioned in the denial letter will not be repeated in this letter.
>
> . . . .

> Although you complain of back pain, the medical examinations perform [sic] by your physicians were essentially normal including motor strength, sensory, gait and flexion/extension of your lumber spine.
>
> . . . .
>
> We acknowledge that the MRI performed on 7/20/01, did show some abnormalities; however, these were unchanged from a prior study performed on 3/29/00, and there was no significant mass effect on the cord or significant narrowing of the subarachnoid space . . . Therefore, the medical evidence does not support a functional impairment that would preclude you from performing your occupation as a Technical Analyst III.

(*Id.* at ¶ 19.)  The letter also informed plaintiff of his right to appeal this decision to the Plan Administrator, which he did.  On November 24, 2001, plaintiff filed a written appeal to the Plan Administrator.  (Pl.'s 56.1 Stmt. at ¶ 59; Doc. No. 40-2.)  In this appeal, plaintiff inserted some new information, specifically that the CNA Plan was not taking into account the mental aspects of his programming job such as deep thinking and problem solving.  Plaintiff submitted a letter from Arnold J. Gelfman, M.A., C.V.E., concluding that "Mr. Bluman cannot currently engage in his most recent occupation or related occupations.  The two obvious debilitating conditions are the pain he experiences and the related depression." (*Id.* at ¶ 60.)  Plaintiff's appeal to the Plan Administrator also included a letter from Dr. Rhee, indicating that "because of his emotional state, I feel he is totally unemployable at this time." (*Id.* at ¶ 61.)  The appeal also contained letters concerning Mr. Bluman from Dr. Eiras (his primary care physician), Theodore J. Batlas, Psy.D. (a psychologist), and two surgical consultations from Michael F. Lospinuso, M.D.  (*Id.* at ¶¶ 62-64.)

Plaintiff's appeal to the Plan Administrator was assigned to Benefits Consultant Ann Laudermilk.  (*Id.* at ¶ 67.)  She denied plaintiff's appeal, stating "based on the records provided, I

find the decision made by the Disability Claim Unit was correct and proper." (*Id.* at ¶ 69.) Ms. Laudermilk also informed plaintiff of his right to request a second level review by the CNA Operations Committee in Chicago. (Defs.' 56.1 Stmt. at ¶ 21; Doc. No. 44-1.)

### 4. *Independent Medical Records Review*

On February 28, 2002, plaintiff submitted a letter and additional medical records and reports to the Operations Committee. The Operations Committee asked Dr. Gregory Arends of the Chicago Institute of Neurosurgery and Neuroresearch to conduct an independent medical records review of plaintiff's file. (*Id.* at ¶ 23.) Dr. Arends found that the medical evidence did not support a disability:

> Critical independent medical review of these records demonstrated that an accurate diagnosis has failed to be established. It appears that the patient does have degenerative cervical spondylosis and possible cervical degenerative disc disease . . . Note should be made that the radiologist's read of these films is that despite the spondylosis and degenerative changes represent [sic], no significant mass effect or significant narrowing of the subarachnoid space in [sic] noted . . . There is no clinical correlation to these radiographic findings anywhere in the patient's notes. In review of the 6 medical doctors who were involved in Mr. Bluman's care, including his primary care physician, 2 neurologists, an orthopedist, and a spine orthopedic specialist as well as a pain management specialist, every examination that I reviewed does not disclose any evidence of neurologic involvement on physical examination. Repeated mention is made in every physical examination of normal strength, normal sensation, and normal reflexes.
>
> The electrodiagnostic studies that were performed on 4/10/00 and 5/4/00 are also inconsistent with the patient's working diagnosis. I am uncertain as to the clinical relevance of the decreased ulnar nerve conduction velocity across the elbow . . . The F-wave studies were reportedly normal . . . Review of the patient's EMG of the right lower extremity on 5/4/00 is even more concerning, this was an extraordinarily limited study that is essentially of no clinical value whatsoever. The patient refused needle examination, which does not allow for the diagnosis of radiculopathy to be made, by definition . . . This is due to the fact that, according to 6 medical doctors who reportedly examined this patient, no mention was made of absent Achilles reflexes . . .

> One cannot interpret the absence of data. The "small central L5-S1 protrusion" at the L5-S1 segment noted on his 3/30/00 MRI is a very common occurrence and is very unlikely to cause bilateral S1 radiculopathy.
>
> I believe that Mr. Bluman's case represents an instance in which several physicians decided to treat an imaging study and poorly conducted electrodiagnostic examination, instead of treating a patient. . . . The patient has no documented evidence on physical examination from multiple sources of radiculopathy, to include weakness or reflex changes objectively. I therefore, do not feel that this patient qualifies for disability. I do not feel that he meets the criteria set forth for total disability. Mr. Bluman either has neurocompressive pathology or he does not. It appears from the medical records submitted that he does not.

(*Id.* at ¶ 23.) The Operations Committee used Dr. Arends' conclusions to deny his final appeal by letter dated April 30, 2002. (*Id.* at ¶ 24.) After exhausting his administrative remedies, plaintiff brought this federal lawsuit on January 23, 2008, seeking judicial review of the Plan's denial of benefits. *See* 29 U.S.C. § 1132(a)(1)(B).

## II. DISCUSSION

### A. Standard of Review

A party seeking summary judgment must "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Hersh v. Allen Prods. Co., Inc.*, 789 F.2d 230, 232 (3d Cir. 1986). The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (noting that no issue for trial exists unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict in its favor). In deciding whether triable issues of fact exist, the court must view the underlying facts and draw all reasonable inferences in favor of the

non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995); *Hancock Indus. v. Schaeffer*, 811 F.2d 225, 231 (3d Cir. 1987).

### B. Application

#### 1. Standard of Review in ERISA Cases

The denial of benefits under an ERISA plan "is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Where, as here, the administrator is vested with discretionary authority to determine eligibility for benefits or to construe the terms of the plan, the court should apply an "abuse of discretion" or "arbitrary and capricious" standard of review[6]. *Metropolitan Life Insurance Company v. Glenn*, 128 S. Ct. 2343, 2348 (2008). "Under a traditional arbitrary and capricious review, a court can overturn the decision of the plan administrator only if it is without reason, unsupported by substantial evidence or erroneous as a matter of law." *Doroshow v. Hartford Live and Acc. Ins. Co.*, 574 F.3d 230, 234 (3d Cir. 2009). The scope of this review is narrow: a court is not free to substitute its own judgment for that of the administrator in determining eligibility for plan benefits. *Id.*

#### 2. Conflict of Interest Analysis

Both parties are correct to point out that a conflict of interest is a factor for the court to consider when determining whether the decision was arbitrary and capricious. *Glenn*, 128 S. Ct.

---

[6] Various courts have called this standard of review "arbitrary and capricious," "abuse of discretion," or even "*Firestone* deference." *Conkright v. Frommert*, 559 U.S. \_\_\_\_ (2010). The Court considers all of these terms interchangeable.

at 2351.  Where a single entity both makes decisions about payment of benefits and pays those benefits from its own pocket, a conflict of interest arises.  *Id.* at 2348.  District Courts, in interpreting *Glenn*, have held that when benefits are funded through a trust rather than the general assets of the employer, there is no conflict of interest.  *See Ketterman v. Affiliates Long-Term Dis. Plan*, 2009 U.S. Dist. LEXIS 86062 (W.D. Pa. August 12, 2009); *Fitzgerald v. Bank of America Corp.*, 2009 U.S. Dist. LEXIS 106277 (E.D. Pa. November 12, 2009).  This is an extension of the doctrine that a conflict of interest does not exist where the employer funds an ERISA plan through fixed contributions.  *Smathers v. Multi-Tool, Inc./Multi-Plastics, Inc. Employee Health and Welfare Plan*, 298 F.3d 191, 198-99 (3d Cir. 2002).

      Here, defendants fund their ERISA plan through a trust, and it is unclear whether payments to that trust remain constant no matter how many payments are approved (leading to no conflict, as in *Smathers*, *Ketterman*, and *Fitzgerald*) or whether payments to the trust would fluctuate based on the claim approval rate, thus leading to a conflict.  Like all other elements of his claim, plaintiff bears the burden of proof.  *Kotorosits v. GATX Corp. Non-Contributory Pension Plan for Salaried Employees*, 970 F.2d 1165, 1173 (3d Cir. 1992) ("Where the sponsor of a Plan reserves for the Plan administrators the discretion to interpret the Plan, anyone urging that a court disregard that reservation has the burden of showing some reason to believe the exercise of discretion has been tainted"); *see also Keith v. The Prudential Insurance Company of America*, 347 Fed. Appx. 548, 551 (11th Cir. 2009) ("[I]t is not the defendant's burden to prove its decision was not tainted by self-interest"); *Landau v. Reliance Std. Life Ins. Co.*, 1999 U.S. Dist. LEXIS 3673 at \*12 (E.D. Pa. 1999) ("*[W]hen a plan beneficiary demonstrates a substantial conflict of interest* on the part of the fiduciary responsible for benefits determinations,

11

the burden shifts to the fiduciary to prove that its interpretation of plan provisions committed to its discretion was not tainted by self-interest") (emphasis added) (internal quotations omitted). Plaintiff introduces no facts or evidence related to the construction of the trust, but instead queries in his brief: "If the trust runs low on funds because of an increase in claims, where will they turn to get the extra cash?" (Pl.'s Br. in Opp. at 5; Doc. No. 51.) It is plaintiff's burden to prove the facts. Posing a hypothetical does not satisfy this burden. Because plaintiff has not shown that the trust funding defendants' ERISA plan is the type that would create a conflict of interest, the Court must conclude that no such conflict exists.

           3.      *The Plan's review of Plaintiff's Claim Was Not Arbitrary and Capricious*

Plaintiff argues in his summary judgment brief that various claims personnel abused their discretion in denying his claim for STD benefits. He argues that: (1) no new evidence was presented between the time he was first approved for STD payments and his second claim, which was denied; (2) that the administrative record contains evidence of biased claims handling; (3) the approval of his claim for temporary disability under New Jersey State law is inconsistent with the denial of benefits under the STD plan; (4) Ms. Laudermilk's decision violates ERISA's claims-handling provisions; and (5) reliance solely on a consultant's paper review while giving no weight to the treating/evaluating physicians constitutes an abuse of discretion.

Defendants, in their motion for summary judgment, argue that the multiple reviews at various levels of the claim process as well as a full investigation and review of Plaintiff's STD benefits claim constituted a full and fair review that by law was not arbitrary and capricious.

           a.      *Lack of Evidence Between First and Second Claims*

Plaintiff leads with the argument that because his first STD claim was approved shortly

after his fall, and because there was no difference in medical evidence between his first claim and the denial of his second claim (which is the subject of this litigation), the decision to deny the second claim must be arbitrary and capricious.  Plaintiff cites to *Post v. Hartford Ins. Co.*, 2008 U.S. Dist. LEXIS 76916 (E.D. Pa. October 2, 2008), a case in which the plaintiff was approved for long term disability payments, returned to work two years later for a period of four months, then was denied disability benefits because the medical evidence did not support a condition of total disability.  *Id.* at *38.  The court in *Post* agreed that because plaintiff's condition had not changed between the initial grant of benefits and the second claim, the denial of that second claim was arbitrary and capricious.

  Defendants distinguish *Post* by noting that the plaintiff in that case was initially totally disabled for a much longer period, two years, and only returned to work for four months before filing a second claim.  Here, plaintiff's original claim was approved for a four month recovery period after which time he was released by his doctors and returned to work. (Pl.'s 56.1 Stmt. at ¶ 97; Doc. No. 40-2.)  Defendants also note that plaintiff remained at work for over a year, significantly longer than the plaintiff in *Post* before filing the second claim.  Finally, defendants note that plaintiff's awareness of his impending termination, coupled with the fact that he remained at work until two weeks before his layoff date, caused the Plan administrators to review his second disability claim with more scrutiny than his first. (Defs.' Br. at 9-10; Doc. No. 52.)

  The Court concludes that the decision to deny plaintiff's second disability claim was not arbitrary and capricious.  The facts of this case are distinguishable from *Post*, both by the time periods the plaintiffs were disabled and working, as well as the intervening fact that plaintiff was facing an impending layoff.  Though there is little evidence that plaintiff's medical condition at

the time of his second claim was different from his medical condition at the time of his first claim, the Court also notes that there is no evidence to prove that his medical condition at the time of his second claim was any different from his medical condition at the time he was released by his treating physician and returned to work. Plaintiff was out of work due to the initial slip and fall for four months. At that point he was released by his doctor and returned to work for a substantial period of time. His second claim for Short Term Disability benefits contained no evidence that anything had changed between the time he was released by his doctor and returned to work for over a year and the time he filed the second claim shortly before his impending layoff. Further, plaintiff received performance reviews of "meets expectations" during this fourteen month period while he was allegedly working in pain. (Pl.'s 56.1 Stmt. at ¶ 65; Doc. No. 44-2.) This belies his claims that he was unable to perform the mental aspects of his job due to his pain.

### b. Biased Claims Handling

Plaintiff next argues that the administrative record contains evidence of biased claims handling, and thus he did not receive a "full and fair hearing" as required by ERISA. 29 U.S.C. § 1133(2). (Pl.'s Br. at 18; Doc. No. 40.) Specifically, plaintiff argues that claims reviewers "totally ignored positive findings [of injury], emphasizing only the negatives." (*Id.* at 19.) Plaintiff notes that Dr. Eiras' MRA showed that plaintiff had multiple herniations, but Nurse Wolfe's report noted that there was "[n]o mention of nerve impingement or disc rupture."[7] (*Id.*)

---

[7] Plaintiff argues that disc rupture is just a syllogism for herniation. Defendants do not dispute this, but note that Nurse Wolfe and Nurse Gloss "acknowledge[d] that the MRI performed on 7/20/01 did show some abnormalities; however, these were unchanged from a prior study performed on 3/29/00. . . ." (Defs.' Br. at 12; Doc. No. 52; AR 128.)

The Court concludes that there is no evidence of biased claims handling, and that plaintiff's claims received a full and fair review. Every evaluation of plaintiff's claims noted the presence of abnormalities. The medical reviewers took note of the presence of these abnormalities, looked at whether there had been any change or deterioration in plaintiff's condition from previous diagnostic tests, and then looked to see whether the positive or abnormal findings correlated with the medical examinations performed during that same period of time. Each of the medical reviewers independently determined that they did not correlate. Further, the fact that all treating physicians agreed that plaintiff was disabled, while the reviewing nurses and doctors did not, is not sufficient to demonstrate that the decision is arbitrary and capricious. *Stratton v. E.I. DuPont de Nemours & Co.*, 363 F.3d 250, 258 (3d Cir. 2004) (quoting *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003)) ("'[C]ourts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation'"). Each step of the claims process included a full and fair review of plaintiff's claim as well as all evidence supporting it, and each reviewing party determined that there was insufficient evidence to support a claim for disability. These actions are not arbitrary and capricious, but rather are thorough and well-considered.

        c.  *New Jersey State Temporary Disability Approval*

Plaintiff next argues that it was arbitrary and capricious for defendants to award state disability benefits to plaintiff while denying STD benefits under the plan. (Pl.'s Br. at 33; Doc. No. 40.) It is undisputed that the same individuals who determined plaintiff was "not disabled"

under the terms of the STD plan also determined that he was qualified for temporary disability benefits under New Jersey's state plan. In order to qualify for benefits under the state law, an individual must demonstrate that he suffers from a condition resulting in his "total inability to perform the duties of employment." N.J.S.A. § 43:21-29.

Defendants argue that the New Jersey state disability claim is not relevant or controlling. They submit their answer to Interrogatory # 19, which states that:

> [A]t the time at issue, it was CNA's understanding and experience that New Jersey State Disability benefits were determined under a different definition of disability than the definition in the CNA Short Term Disability Plan and that, with limited exceptions, New Jersey state disability benefits were payable upon an opinion from the treating doctor *even if the plan disagreed with the treating doctor.*

(Defs.' Answer to Pl.'s Interrog. No. 19; Doc. 41-2) (emphasis added). Defendants argue that they thought an approval for New Jersey state disability benefits was required because the treating doctor's opinions controlled. Plaintiff argues that this is a hearsay statement, and cites two sixth circuit cases and a second circuit case which hold that courts cannot consider hearsay when reviewing summary judgment motions. (Pl.'s Reply Br. at 12; Doc. No. 54.) However, this statement is not hearsay. Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." FED. R. EVID. 801(c). The statement at issue is a statement made by a defendant (CNA) about its own belief that the New Jersey disability laws differed from the STD laws. This is not hearsay.

Here, defendants approved the New Jersey Temporary Disability claim because they thought that a certification from the treating physician is all that was necessary and that no

16

further review was needed. (Defs.' Answer to Pl.'s Interrog. No. 19; Doc. 41-2.) The New Jersey Temporary Disability Law provides for benefits except:

> for any period during which the claimant is not under the care of a legally licensed physician . . . who, when requested by the division, shall certify within the scope of the practitioner's practice, the disability of the claimant, the probable duration thereof, and, where applicable, the medical facts within the practitioner's knowledge.

N.J.S.A. § 43:21-39(d). This statute appears to support defendants' contention - that once the treating physician certifies the claimant's disability, benefits are to be paid. Their actions support this – plaintiff admits that the first STD claim and the Social Security benefits were approved "based on little more than a diagnosis and a doctor's disability certificate." (Pl.'s 56.1 Stmt. at ¶¶ 76-79; Doc. No. 44-2.) The approval of New Jersey disability benefits coupled with the denial of STD benefits, in the context of this case, does not rise to the level of arbitrary and capricious. Even taking all inferences and viewing all facts in the light most favorable to the plaintiff, the Court concludes that under the facts of this case, the grant of New Jersey disability benefits is not dispositive of biased claims handling under the arbitrary and capricious standard.

### d. Ms. Laudermilk's Decision

Plaintiff next argues that Ann Laudermilk, the administrator who denied his final appeal before the independent review, erred by "rubber stamping" previous claim denials without giving reasons for the conclusion. (Pl.'s Br. at 37-38; Doc. No. 40.) Relevant provisions of ERISA require "adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial . . ." 29 U.S.C. § 1133. This letter from Ann Laudermilk informed plaintiff that she believed that the previous decision was correct and proper. When a denial letter relies on previous denial letters that have

already explained the reasons for the denial, the explanations of the earlier letters are incorporated. *McElroy v. SmithKline Beecham Health and Welfare Benefits Trust*, 340 F.3d 139, 144 (3d Cir. 2003) (holding that, when the later letter "does not explain the reason for the offset because [defendant] had already explained the reason," due process requirements of ERISA had been followed). Therefore, the Court concludes that plaintiff had been informed of the reasons for the denial of his claim on several occasions prior to Ms. Laudermilk's denial, and her letter incorporated the reasoning in the prior letter.

> e.  *Reliance on Paper Review*

Finally, plaintiff argues that the reliance on a consultant's paper review, while giving no weight to the evaluating physicians, constitutes an abuse of discretion meriting reversal. (Pl.'s Br. at 40; Doc. No. 40.) The "paper review" to which plaintiff refers is the final report of Dr. Gregory Arends, the independent consultant hired by the plan after Ms. Laudermilk's denial. Plaintiff argues that Dr. Arends made biased findings, did not conduct an independent medical exam, and did not explain the reasons for his denial sufficiently. For the reasons already stated herein, the Court concludes that Dr. Arends' review was proper. He adequately weighed all of the evidence and came to his conclusion. The fact that this conclusion differed from the treating physicians is not probative. *Stratton*, 363 F.3d at 258. Therefore, the Court concludes that when Dr. Arends reviewed, discussed, and analyzed the diagnostic tests submitted to him, his methods were not arbitrary and capricious. Further, reliance on the opinion of an outside specialist is evidence that a proper review occurred. *Davis v. Unum Life Ins. Co. of America*, 444 F.3d 569, 575 (7th Cir. 2006) ("[A]n administrator's decision to 'seek[] independent expert advice is evidence of a thorough investigation'").

       *f.*  *Conclusion*

  The plaintiff in this action received a full and fair hearing of his disability claim at all levels of the process. At each level, the claim was denied because his medical examinations were essentially normal "including motor strength, sensory, gait and flexion/extension of your lumber spine." (AR 127.) Every level of review, including the appeals which incorporated the same information as the more preliminary reviews, mentioned that there was a medical condition, and specifically noted that plaintiff did have physical ailments. However, the Plan determined that the plaintiff was not completely disabled, as he was able to perform sedentary work. Even accounting for the mental aspect of his position, plaintiff was still found not to be disabled because he received satisfactory reviews of his work during the fourteen months that he was on the job. Arbitrary and capricious is a high standard, and the plaintiff has not met his burden of proving that the defendants acted with such disregard to rise to this level.

### III. CONCLUSION

  For the reasons set forth herein, the plaintiff's motion for summary judgment (Doc. No. 40) will be denied and the defendants' motion for summary judgment (Doc. No. 44) will be granted. An appropriate form of order is filed herewith.

Dated: June 4, 2010

                 s/ Garrett E. Brown, Jr.
                GARRETT E. BROWN, JR., U.S.D.J.